UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| H.M. & I.B., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NO. _____ |
| JAY SHRI HANUMAN, INC., d/b/a | ) | |
| THE ECONOLODGE, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs file this Complaint and show the Court the following:

1.

In 2014, when they were both 18 years old, Plaintiffs were trafficked for sex at the EconoLodge located at 4980 Cowan Road, Acworth, Georgia 30101. Given the nature of the case, Plaintiffs are identified in this Complaint by their initials to prevent public disclosure of their names. Plaintiffs' counsel will disclose Plaintiffs' full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

---

[1] Plaintiffs have concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include Plaintiffs' sex trafficking. Plaintiffs' anonymity will provide for their own personal safety and will protect Plaintiffs from the public disclosure of details that are intimate and personal in nature.

2.

Defendant Jay Shri Hanuman, Inc. ("Defendant" or "EconoLodge") is a Georgia corporation authorized to transact business in Georgia. Service can be made on Defendant by serving its Registered Agent: Dulip Patel, 4980 Cowan Road, Acworth, Georgia 30101.

3.

Jurisdiction and venue are proper as to Defendant.

4.

At all times herein, Defendant owned, operated, maintained, controlled, managed, or was responsible for securing the EconoLodge, a hotel from which it benefited financially.

5.

Defendant knew of the rampant sex trafficking and prostitution at the hotel for years, before, during, and after Plaintiffs' trafficking. Defendant knew because

   (a)   Defendant knew the facts of these specific Plaintiffs while they were trafficked for sex at the hotel;

   (b)   its employees knew of and permitted sex trafficking and prostitution to occur at the hotel;

   (c)   Defendant knew the facts of multiple other sex trafficking victims at the hotel before, during, and after Plaintiffs;

(d)    Defendant knew about frequent and ongoing similar crime occurring at the

hotel;

(e)    Defendant knew about the reports of hotel guests regarding sex trafficking

and prostitution-related activities;

(f)    Defendant had knowledge of sex trafficking generally in the Atlanta area

and at this hotel specifically.

6.

Sex trafficking and prostitution were common occurrences at the EconoLodge

and Defendant chose to ignore, allow, condone, facilitate, support, or permit such

activity at the hotel. Defendant is liable to Plaintiffs for its actions and failures to

act. Defendant's liability to Plaintiffs is straightforward:

(a)    The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18

U.S.C. § 1595(a), provides a cause of action to victims of sex trafficking

against "whoever knowingly benefits, financially or by receiving anything

of value from participation in a venture which that person ***knew or should***

***have known*** has engaged in an act in violation of" the TVPRA. Defendant

knowingly benefited from participation in a venture that it knew or should

have known engaged in an act in violation of the TVPRA. While operating

the hotel, Defendant (i) rented rooms to Plaintiffs' traffickers so Plaintiffs

could be beaten and sold for sex at the hotel, (ii) collected fees for rental

of those rooms, and (iii) did so despite what it knew or should have known about Plaintiffs being victims of sex trafficking at the hotel. As a result, Defendant is liable to Plaintiffs for their damages under the TVPRA.

(b)     The EconoLodge constituted both public and private nuisances under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiffs were sold for sex at the EconoLodge, causing their substantial harm.

7.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant and the EconoLodge.

## OPERATIVE FACTS

**I.      Plaintiffs' trafficking at the EconoLodge.**

8.

Over the course of several months in 2014, when they were both 18 years old, Plaintiffs were forcibly sold for sex at the EconoLodge until the end of October that year. Plaintiffs' traffickers were older men who belonged to multiple violent gangs. Plaintiffs' traffickers were frequently violent with them at the EconoLodge and often threatened to kill Plaintiffs if they tried to escape.

9.

Employees at the EconoLodge assisted and facilitated Plaintiffs' trafficking. They were friendly to and interacted frequently with Plaintiffs' traffickers. Hotel staff allowed Plaintiffs' traffickers to pay for their rooms late to allow the traffickers to make money by selling Plaintiffs for sex and then paying the hotel for the room. In essence, the hotel loaned the traffickers a room for later payment of the proceeds from Plaintiffs' trafficking.

10.

Plaintiffs' traffickers paid multiple staff members at the hotel to act as look-outs and allow Plaintiffs' sex trafficking at the hotel. If too much attention was drawn to the illegal activity in Plaintiffs' rooms, front desk staff would move the trafficking operation to a different area of the hotel to keep it hidden.

11.

Once, one of Plaintiffs' traffickers got into an argument with a potential buyer in front of Plaintiffs' room at the EconoLodge. The trafficker hit the man so hard that he fell and split his head open on the second-floor walkway in front of the room, resulting in a large pool of blood. A housekeeper from the hotel quickly came over and brought bleach with her. The housekeeper and the trafficker worked together to clean the blood up before the police arrived. Before the police arrived, the house-keeper and the trafficker concocted a false story to tell the police and protect the trafficker. When the police came and the man was taken away unconscious in an ambulance, the trafficker and the housekeeper lied to the police and told them that someone else had hit the man and driven away. Thus, the trafficker was allowed to continue trafficking Plaintiffs at the EconoLodge.

12.

While Plaintiffs were trafficked at the EconoLodge, they collectively were sold for sex to between 10 and 25 men each day. Defendant knew or should have known that the number of daily, older, male visitors to the room was clearly indica-tive of sex trafficking.

13.

While Plaintiffs were trafficked for sex at the EconoLodge, they exhibited numerous well-known and visible signs of a sex trafficking victim, of which

Defendant knew or should have known, including their young ages and inappropriate appearances, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of Plaintiffs by their traffickers.

## II.      Defendant's knowledge of prior crime at the EconoLodge.

### 14.

The EconoLodge was well known for crime, prostitution, and sex trafficking. Defendant had actual and constructive knowledge of criminal activity existing on the property and in the surrounding area prior to Plaintiffs' trafficking.

### 15.

Defendant owned and operated the EconoLodge and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

### 16.

Before Plaintiffs' sex trafficking at the EconoLodge, prostitution and sex trafficking were frequent occurrences at the hotel, obvious to employees and guests.

### 17.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Plaintiffs' sex traffickers brought them to the EconoLodge to be sold for sex for months.

18.

Defendant knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the EconoLodge prior to Plaintiffs' sex trafficking there.

19.

Defendant had actual or constructive knowledge of publicly available online reports that the owner of the hotel solicited guests at the hotel to find him women to sleep with him for money:



**plain out nasty**

Review of Econo Lodge

●○○○○ Reviewed Feb 5, 2011

keeshaalexander
acworth

🗐1 👍1

we stayed there for a couple weeks and the owner would just walk into our room when we r sleeping or gone out he would ask the people that called us who they were ask us to find a female that would come stay with him in the office for money he would call our room and ask us to call our friends and ask them to come and sleep with him for money he makes his staff live there so he wont have to pay them and if they move out he will fire them the police r watchin the motel cuz he rents to druge deallers and prositutes his mantince men smoke crack and steals proptey from geust out of their rooms while they r away and sells it to the doallar store across the street STAY AWAY FROM THERE!!!!!

More

Date of stay: January 2011

## III.    Defendant's knowledge of sex trafficking generally.

20.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims

Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

21.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the EconoLodge. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[2] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs.

---

[2] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Sept. 9, 2024); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Sept. 9, 2024).

22.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

23.

Defendant knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

24.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving hotels and motels reported sex trafficking, and another 2.6 percent reported a

---

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Sept. 9, 2024).

[4] *Id.*

combination of sex and labor trafficking.[5] A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[6] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with hotels at some point" during their exploitation.[7] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from hotel staff."[8]

25.

Defendant knew or should have known that attorneys for the hotel industry estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels,[9] and that the industry had been warned,

---

[5] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Hotel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2021).

[6] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[7] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Sept. 9, 2024).

[8] *Id.* at 23.

[9] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].

among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[10]

26.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[11]

27.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a)    establish corporate policy and procedures against sexual exploitation of children;

(b)    train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)    include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

---

[10] *Id.* at 19.

[11] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Sept. 9, 2024).

(d)    provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)    support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)    report annually on the company's implementation of Code-related activities.

28.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

29.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)    persons who lack freedom of movement or are constantly monitored;

(c)    persons who have no control over or possession of money or ID;

(d)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)    requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f)    the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)    extended stay with few or no personal possessions in the room;

(h)    excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)    the same person reserves multiple rooms;

   (1)    a room is rented hourly, less than a day, or for an atypical extended stay;

   (2)    attempts to sell items to or beg from patrons or staff;

   (3)    cars in the parking lot regularly parked backward, so the license plates are not visible;

   (4)    loitering and solicitation of male patrons;

   (5)    waiting at a table or bar and picked up by a male (trafficker or customer);

   (6)    persons asking staff or patrons for food or money; and

   (7)    persons taking cash or receipts left on tables.

30.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' case, EconoLodge, for a fee, provided this market for Plaintiffs to be confined and sold.

## COUNT I: STATUTORY LIABILITY UNDER 18 U.S.C. § 1595

31.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

32.

In violation of § 1595(a) of the TVPRA, Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

33.

Defendant knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the EconoLodge, including the revenue generated for the rooms in which Plaintiffs were trafficked.

34.

Defendant participated in a hotel venture and knew or should have known that their operation of the hotel violated the TVPRA by harboring and maintaining Plaintiffs so that they could be sold for sex at the EconoLodge.

35.

The venture in which Defendant participated was in or affecting interstate commerce.

36.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives, participated in Plaintiffs' sex trafficking at the EconoLodge. Defendant should have known of this participation.

37.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant' agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the hotel before and while Plaintiffs were trafficked for sex at the EconoLodge.

38.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

39.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

40.

Defendant is liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

41.

Defendant is jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs, whose damages were proximately caused by the acts discussed in this count.

**DAMAGES**

42.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

43.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiffs sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendant for their injuries suffered in the incidents at issue and seek to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general, and punitive damages permissible under Georgia and federal law.

Plaintiffs seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a)   Personal injuries;

(b)   Past, present, and future conscious pain and suffering;

(c)   Loss of enjoyment of life;

(d)   Medical expenses;

(e)   Mental anguish and emotional distress;

(f)   Loss of past, present, and future wages;

(g)   Incidental expenses; and

(h)   All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law.

44.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

45.

Defendant's actions evidence a species of bad faith. Defendant was and is stubbornly litigious and has caused Plaintiffs undue expense. Thus, Plaintiffs are

entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. *See, e.g.*, O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendant and for the following:

(a)   Process issue as provided by law;

(b)   Plaintiffs be awarded actual damages from Defendant in amounts to be shown at trial;

(c)   Plaintiffs be awarded from Defendant all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury;

(d)   Plaintiffs be awarded a trial by jury; and

(e)   Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on September 9, 2024.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*

-19-

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
RORY A. WEEKS
Georgia Bar No. 113491
rweeks@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

Respectfully submitted on September 9, 2024.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
RORY A. WEEKS
Georgia Bar No. 113491
rweeks@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile